IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WENDY STURZ,

                                                    OPINION and ORDER
                    Plaintiff,
                                                    08-cv-625-bbc
              v.

STATE OF WISCONSIN
DEPARTMENT OF CORRECTIONS,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Wendy Sturz leads a challenging life.  She suffers from a degenerative joint disease that makes it difficult for her to engage in many activities most people take for granted, such as walking, reaching and even sleeping.  In 2003 and 2004, plaintiff was working as a probation and parole agent for defendant Wisconsin Department of Corrections.  She requested a number of accommodations for her condition, including an electric door to get into the office building, maintenance of the parking lot after inclement weather, a reduced workload and eliminating home visits that threatened her health and safety.  Although defendant approved a number of her requests, most were not implemented.  After waiting for more than a year, plaintiff decided she could not wait any longer and

1

retired.

Plaintiff contends that defendant's failure to accommodate her disability violated her rights under the Rehabilitation Act, 29 U.S.C. § 794, and led to her constructive discharge. Defendant's motion for summary judgment is ripe for review.  I will grant the motion with respect to plaintiff's claim that defendant failed to accommodate her request to work from home because she has failed to show that the policy prohibiting that request is unreasonable. The motion will be denied in all other respects because a reasonable jury could find that defendant violated the Rehabilitation Act by failing to provide the remaining requests and that defendant's failure led to plaintiff's constructive discharge.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

UNDISPUTED FACTS

A.  <u>Plaintiff's Disability</u>

Plaintiff Wendy Sturz suffers from chondromalacia (a softening of the back of her knee cap), Ehlers Danlos Syndrome (loose ligaments) and arthritis.  As a result of Ehlers Danlos Syndrome, plaintiff has unstable joints and is prone to sprains and dislocations.  The condition affects joints in her knees, shoulders, back, neck and ankles.  Plaintiff's joint disease is degenerative, meaning that the cartilage in her joints is eroding in her knees,

2

elbows, shoulders and ankles.  This causes her significant pain when she goes up and down stairs, gets up from chairs and reaches for things.  Despite more than 20 surgeries plaintiff has had performed, she cannot walk or stand without pain for more than five minutes and has difficulty maintaining her balance.  She walks with a limp and a slow gait.  She also has difficulty sitting for any period of time and moving heavy objects.  Driving for more than 30-45 minutes causes pain in her lower back and knees.

### B.  Plaintiff's Requests for Accommodations

Plaintiff began working as a probation and parole officer for defendant Wisconsin Department of Corrections in 1993.  Defendant receives federal funding.  In 2003 and 2004, plaintiff worked at defendant's office in the village of Ellsworth.  Defendant did not have any problems with plaintiff's work performance.

As early as 2000, defendant was aware that its Ellsworth office had problems with accessibility for people with disabilities, in particular with respect to the parking lot and the front door.  In July 2003, plaintiff's doctor wrote defendant, requesting accommodations to plaintiff's work schedule that would allow her to continue working:

> I am sending you this letter regarding a patient of mine, Wendy Sturz.  As you are probably aware, she has had a significantly rocky course with severe joint disease over the last several years.  Symptoms are getting worse for her and we are trying to find some solution that maximizes her functioning and productivity while we attempt to find different medical therapies.  At this time, her pain level is such that I feel the

3

time has come to limit her work to a certain extent.  I recommend at this point that she should not work for than three consecutive days without having a day off in between and she should limit her total work hours to thirty per week at this time. Being able to limit the amount she is working does give her some relief making the days that she is there more productive and functional.

If you have any questions or need any addition[al] information or would like me to fill this out on an FMLB form, I would be happy to do so.  Please let me know if you need this information.  Thank you very much for considering this.

After plaintiff spoke with Tom Petta, her supervisor, Petta approved a reduction in hours and plaintiff began taking Wednesdays off.  Although she was supposed to be working no more than 30 hours a week, she was unable to keep that schedule because defendant did not reduce her caseload.  When plaintiff complained about this issue to Petta, his response was, "We are all busy."  However, he told her that she could not "report" more than 30 hours a week.

In September 2003, plaintiff submitted a written request for accommodations, including maintenance of the parking lot, installation of an electric door, permission to work at home during winter months when the weather was bad, a reduction in the number of home visits and a reduction in her caseload.   Plaintiff needed these accommodations to reduce stress and strain on her joints and reduce the need to be mobile.

The parking lot had a steep angle, making it especially difficult for plaintiff to walk on it when snow or ice was present.  The village was responsible for plowing the parking lot, but it failed to plow or sand the lot well.  Plaintiff fell several times because the parking lot

4

was not properly cleared.

Plaintiff requested an electronic door opener because she found the exterior door for the office building heavy and cumbersome to open.  It became even more difficult after October 2003, when plaintiff followed her doctor's recommendation and purchased an electric scooter to get around at work.  In order to get through the door in her scooter, plaintiff had to "reach across, open the latch back up enough to get the scooter through, push the door, and then try to get through while the door was still open."  Plaintiff opened the door several times during the day to conduct business for defendant and to take breaks. Opening the heavy door exacerbated her medical conditions, particularly with respect to her shoulders.

Conducting home visits was problematic as well.  Stairs and unkempt lawns made it difficult for plaintiff to maintain her balance.  In the winter many clients' homes had walks that were not shoveled.

In October 2003 Petta and Larry Liegel (Petta's supervisor) spoke with plaintiff about her requests.  Petta and Liegel said that an electric door and a case load reduction were reasonable requests and that they would speak to the village about the parking lot "issue."

With respect to home visits, plaintiff requested a waiver for visits that posed a risk to her safety.  In particular, plaintiff discussed home visits that required her to climb stairs. Under defendant's policies, "[v]isits to an offender's residence can be waived."  Such

5

"[w]aivers should be selective . . . based on assessment of risk."  One reason for waiver may be "accessibility of residence."  Liegel and Petta rejected plaintiff's request to waive any home visits, telling her that her "physical problems" were not a valid reason for a waiver. They also rejected plaintiff's request to work from home during inclement weather.

In a followup letter to the Office of Diversity dated November 12, 2003, Liegel reaffirmed the views stated during the meeting, adding that it was reasonable to assign plaintiff more "office-bound" tasks such as presentence investigations and that it was unreasonable to ask the village to alter the parking lot but that Liegel would "ensure proper maintenance" of the parking lot during "routine supervisory visits."  He outlined the process for obtaining an electric door, stating that the department would pay for the door and Petta would obtain bids for it.

With respect to plaintiff's request to reduce home visits, Liegel wrote the following:

> Community safety will likely be compromised if home visits are reduced or eliminated.  Home visits are based on potential offender risk.  The Supervisor will certainly examine all feasible alternatives, including waivers, but home visits will not be eliminated.  This workload will certainly impact her coworkers, it cannot be avoided.  That's why we have a workload adjustment policy (AD-03-10).  That is entirely a supervisory decision, not a personnel decision.

> Supervisor Petta will examine Agent Sturz' caseload and determine which offender cases would pose a health and safety risk to her, based on medical limitations, should she be required to conduct home visits.  Those specific cases will be transferred to other agents in the Ellsworth office, because home visits are required to maintain public safety.  The receiving agent will assume complete supervision of these cases.  The operation of the office will be able to handle this change through the

6

use of overtime, and if Region 5 can fill a half-time agent position recently created for Ellsworth.

With respect to plaintiff's request for a reduction in her caseload, Liegel wrote:

It is a reasonable request to reduce her workload to a percentage equal to her reduced hours of work.  Other employees will be assigned the necessary workload, pursuant to AD-03-10.  If the supervisor assigns more office-bound tasks such as PSIs, that would be reasonable.

## C.  Implementation

The Department of Administration approved the request for an electric door in November 2003.  However, defendant did not install an electric door until early 2005. Liegel acknowledges that "it certainly took a long time" to install the door, but he cannot explain the reason for the delay.  Petta's only explanation is the plaintiff's request was "not high on his list."

Petta did not examine plaintiff's case load to determine which cases should be transferred to other agents because they posed a health and safety risk to plaintiff.  Liegel and Petta failed to give plaintiff additional presentence investigations, despite Liegel's conclusion that this was a reasonable way to reduce her home visits.

It was Petta's obligation to implement the case load reduction approved by Liegel. Although he knew that plaintiff had a full time caseload, he took no actions to reduce it. Generally, plaintiff needed to work 36-38 hours a week to maintain her caseload.

On February 26, 2004, the Department of Administration sent a letter to the village regarding maintenance of the parking lot after inclement weather.  However, after the letter, when the condition of the parking lot did not improve, defendant did not follow up.  In particular, defendant "did not sen[d the village] a cease and desist letter, penaliz[e] the landlord, asser[t] a breach of the lease or take on the maintenance itself (by hiring it out) and charg[e] it back to the Village."  Plt.'s PFOF ¶ 245, dkt. #38.

Beginning in the summer of 2004, plaintiff had weekly conversations with Petta about her accommodation requests.  She said that her pain was getting worse, that her health was declining, that she was frustrated that defendant had not done the things it said it would do and that if things did not change she would have to retire.

By December 4, plaintiff was throwing up from the amount of pain she was experiencing.  She was not sleeping and had lost 40-50 pounds.  After plaintiff took medical leave to have surgery on her knee, she determined that she could not return to work.  In a letter dated January 9, 2005, she wrote:

[My primary care physician and I] decided that due to my worsening health, dangerousness of occupation, and lack of action to accommodate my disability, it is in my best interest not to return to work and to file for total and permanent disability.  My intention is to continue to use sick time until it is depleted or until such time as my long term disability insurance begins, whichever occurs first.

OPINION

8

A.  Reasonable Accommodation

The Rehabilitation Act and the Americans with Disabilities Act recognize that true equality means more than simply treating everyone the same without regard to their differences.  Under these laws, the meaning of discrimination encompasses not just disparate treatment, but the failure to provide qualified disabled persons with "reasonable accommodations" that allow them to participate equally in the workforce with nondisabled persons.  42 U.S.C. § 12112(b)(5); 29 U.S.C. § 794(d).

Plaintiff brings her claim under the Rehabilitation Act only, presumably because sovereign immunity protects state agencies from suits under the ADA but not the Rehabilitation Act.  Compare Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356 (2001) (ADA does not abrogate state sovereign immunity), with Miller v. Texas Tech University Health Sciences Center, 421 F.3d 342, 348 (5th Cir. 2005) (state agencies waive sovereign immunity from claims under Rehabilitation Act by accepting federal funds).  However, there is little practical difference between the two types of claims because the Rehabilitation Act borrows its standards for liability from the ADA. Burks v. Wisconsin Dept. of Transportation, 464 F.3d 744, 756 n.12 (7th Cir. 2006).

For the purpose of summary judgment, defendant does not deny that plaintiff is disabled within the meaning of the Rehabilitation Act, that she was qualified for her job or that defendant was aware of her disability. King v. City of Madison, 550 F.3d 598, 600 (7th

9

Cir. 1998) (elements of claim under Rehabilitation Act are: (1) plaintiff is disabled; (2) she is otherwise qualified for the job; and (3) defendant is aware of disability and (4) defendant failed to provide reasonable accommodation to plaintiff). The primary question in this case is whether defendant violated plaintiff's rights under the Rehabilitation Act by failing to provide her with "reasonable accommodations."

Under this circuit's precedent, the term "reasonable" has two components in this context: "efficacious" and "proportional to costs." Oconomowoc Residential Programs v. City of Milwaukee, 300 F.3d 775, 784 (7th Cir. 2002) (citing Vande Zande v. State of Wisconsin Dept. of Administration, 44 F.3d 538, 543 (7th Cir. 1995)). In explaining why it was reasonable not to provide plaintiff's requested accommodations, defendant's mantra is that plaintiff is not entitled to pick her own accommodations. Jay v. Intermet Wagner Inc., 233 F.3d 1014, 1017 (7th Cir. 2000). This is true, but unhelpful. *Neither* the employee nor the employer may unilaterally determine what constitutes a reasonable accommodation under the act. Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 693 (7th Cir. 1998). Rather, an employer must engage in an "interactive process" with the employee to determine what an appropriate accommodation would be. Corder v. Lucent Technologies Inc., 162 F.3d 924, 928 (7th Cir. 1998); Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1134 (7th Cir. 1996); Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 563 (7th Cir.1996). The employer has a "duty to consult with the employee to

determine the precise job-related limitations imposed by the disability and how those limitations could be overcome with a reasonable accommodation." <u>Lenker v. Methodist Hospital</u>, 210 F.3d 792, 797 (7th Cir. 2000).  In other woods, just as an employee may not impose a "wish list" on the employer, <u>Miranda v. Wisconsin Power & Light Co.</u>, 91 F.3d 1011,1017 (7th Cir. 1996), defendant was not entitled to deny out of hand requests by plaintiff that were efficacious and proportional to costs simply because it had provided other accommodations to her. <u>EEOC v. Sears, Roebuck & Co.</u>, 417 F.3d 789, 802 (7th Cir. 2005) ("[T]he employer is obliged to provide an accommodation that effectively accommodates the disabled employee's limitations.").  The reasonableness of each request must be reviewed separately.  <u>Oconomowoc Residential Programs</u>, 300 F.3d at 784 ("Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties.")

Normally, an employer challenges an accommodation on the ground that it is too expensive to implement or that providing it would eliminate an essential function of the job. <u>E.g.</u>, <u>Ross v. Indiana State Teacher's Association Insurance Trust</u>, 159 F.3d 1001, 1015-16 (7th Cir.1998) (request of teacher's association director to have all teachers' meetings in his office not reasonable accommodation when essential function of job was to meet with teachers outside his office).  Defendant does not develop an argument for either issue, so those issues are waived for the purpose of its motion for summary judgment.

11

In its reply brief, defendant raises an argument that it is "almost impossible" for plaintiff to prove that her accommodation requests were reasonable because "she makes the allegation in her complaint, and the admission in her brief, that she was a qualified individual with a disability because she was able to perform the essential functions of her job with or *without* reasonable accommodation." Dft.'s Br., dkt. #42, at 4 (emphasis in original). In other words, unless it was impossible for plaintiff to do her job without the accommodations, she was not entitled to them under the Rehabilitation Act.

Defendant's position is problematic for a number of reasons. First, because plaintiff raised this argument for the first time in its reply brief, it is waived. Nelson v. LaCrosse County Dist. Attorney, 301 F.3d 820, 836 (7th Cir. 2002). Second, plaintiff's position at summary judgment is that she could *not* perform her job without the accommodations; this was a reason she gave for leaving defendant's employment.

Perhaps most important, defendant's argument suggests a disturbing standard for determining whether an accommodation is reasonable. It may be that plaintiff could open the front door with great difficulty or make her way through the parking lot without falling each time, but should she have to?  A paraplegic might be able to get out of her wheel chair and pull herself up a flight of stairs as well, but that does not mean an employer may refuse to install a ramp or an elevator on that ground.

Reasonable accommodations include more than just things that are medically

necessary.  They include "making existing facilities used by employees *readily accessible* to and usable by individuals with disabilities."  42 U.S.C.A. § 12111(9)(A) (emphasis added). More generally, they include "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy *equal benefits and privileges* of employment as are enjoyed by its other similarly situated employees without disabilities."  29 C.F.R. § 1630.2(o)(iii) (emphasis added).  See also Vande Zande, 44 F.3d at 545 (concluding that accommodation was not required when its absence did not "interfer[e] with [plaintiff's] ability to work or with her physical comfort"; accommodations are sufficient when they make work experience of disabled person "equivalent" to that of nondisabled persons).

In any event, plaintiff has adduced evidence that she needed the accommodations to reduce stress on her joints and that not having the accommodations exacerbated her conditions.  (Defendant challenges plaintiff's expert testimony on this issue, but again, that issue is waived because defendant failed to raise it until its reply brief, and even then, defendant failed to develop the argument.)  That is more than sufficient; plaintiff did not have to show it was physically impossible to do her job before defendant was obligated to provide her with an accommodation.

Defendant cites Rauen v. U.S. Tobacco Manufacturing Ltd. Partnership, 319 F.3d 891 (7th Cir. 2003), but it does not support defendant's "impossibility" standard.  In that case, the plaintiff made a request to work from home because of the number of times she

13

needed to use the bathroom throughout the day.  This type of inconvenience cannot be compared to plaintiff's situation; the plaintiff in Rauen adduced no evidence that her condition was made worse by the lack of accommodations.

With respect to most of the accommodations plaintiff requested, defendant's reasons for failing to implement them are not persuasive. Defendant's position is particularly difficult because it approved many of the accommodations that are at issue in this lawsuit.

1.  Reduced schedule and workload

With respect to plaintiff's request for a reduced schedule, defendant says that it accommodated plaintiff's request by prohibiting her from *reporting* more than 30 hours a week.  However, this was the worst of both worlds for plaintiff because it is undisputed that defendant continued to give her the same workload, despite assurances that it would be reduced.  Thus, the reduction in hours was illusory.   In its reply brief, defendant says that "Petta was having difficulty getting enough staff to cover case loads," Dft.'s Br., dkt. 42, at 16, suggesting that defendant believes the accommodation was unreasonable.  Defendant is free to raise this issue at trial, but I cannot grant summary judgment to defendant on this ground because he did not raise the issue in his opening brief, propose facts on this question or even develop the point in his reply brief.  Although it is ultimately plaintiff's burden to prove that an accommodation is reasonable, Vande Zande, 44 F.3d at 543, defendant must

14

properly raise that issue in its motion for summary judgment before that burden is triggered. Edwards v. Honeywell, 960 F.2d 673, 674 (7th Cir. 1992) ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not.").

2.  Electric door

Defendant offers no reason why it failed to put in an electric door for more than a year.  Defendant cites Jay, 233 F.3d at 1017, for the proposition that even a 20-month delay may be reasonable, but that is only when the employer acts in "good faith."  In this case, defendant says in its brief that "outside forces" contributed to the delay, Dft.'s Br., dkt. #17, at 7, but it fails to explain this or cite any evidence in support of it.  Again, defendant is free to raise this issue at trial if it has evidence that it acted reasonably and in good faith.

Defendant's other argument regarding the electric door is less clear.  It says that the electric door was "not of great consequence" to plaintiff because she opened the door herself when she went on breaks and she decided to retire even after they replaced the door in 2005. Defendant does not explain why these observations are relevant.  To the extent it means to say that plaintiff was not entitled to the accommodation because she was capable of opening it herself, this is a variation on the "impossibility" standard that I have rejected.  It is undisputed that it was difficult for plaintiff to open the door and that doing so exacerbated

15

her condition.  That is sufficient.  Defendant cites no authority for the proposition that a disabled person "waives" her right to an accommodation if she tries her best to make do without one.

Further, it is misleading to say that plaintiff retired despite defendant's installation of the electric door. Plaintiff already had already stopped working by that time.  Although technically she was still employed by defendant, this was only because she was using up her sick time.  In any event, the door was only one of several accommodations that plaintiff said she needed but did not receive; defendant is confusing "necessary" with "sufficient."  I cannot say as a matter of law that an electric door was an unreasonable accommodation simply because plaintiff determined that she needed other accommodations as well.

3.  Parking lot maintenance and working from home during winter

I will consider these two requests together because they are related: plaintiff says that her request to work from home during the winter was the result of the difficulty she had in the parking lot after inclement weather.  In denying plaintiff's request to work from home, defendant told plaintiff that it would be a violation of policy because of liability issues and other concerns.  E.g., Rauen, 319 F.3d at 896 ("a home office is rarely a reasonable accommodation").  Perhaps plaintiff could have shown that an exception to the rule was warranted in her case, but she has not developed any argument that defendant's policy is an

16

unreasonable one.  Accordingly, plaintiff has not met her burden on summary judgment to show that a genuine issue of material fact exists.

However, if defendant could not allow plaintiff to work from home, it became that much more important to insure that the parking lot was maintained in a manner that kept the office "readily accessible" to her.  42 U.S.C.A. § 12111(9)(A).  Defendant does not develop any arguments about the parking lot in its opening brief, so this issue is waived for the purpose of summary judgment.  In its reply brief, defendant suggests that it did all it could by sending the village a letter.  That remains to be seen.  Although it may have been the village's responsibility to clear the parking lot, it was defendant's obligation to keep the office accessible for plaintiff.  Plaintiff identifies a number of other actions that defendant could have taken and defendant does not argue that any of them were unreasonable or unduly burdensome.  This issue must proceed to trial.

4.  Home visits and presentence investigations

In the November 13 letter, Liegel concluded that giving plaintiff more presentence investigations was a reasonable way for plaintiff to reduce her home visits and he directed Petta to determine which home visits posed a risk to plaintiff's health and safety as a result of accessibility issues.  Defendant concedes that Petta never did this and defendant makes little effort to justify this failure.  It cites Mobley, 531 F.3d at 546, for the proposition that

17

"an employer's denial of an employee's request for the assignment of more report-writing [is] not employment discrimination." Dft.'s Br., dkt. #42, at 17, but that is a misstatement of the case. The primary issue in Mobley was whether the plaintiff was entitled to work from home. The court did not discuss "report-writing" at all. Defendant may be referring to the plaintiff's request to work on a particular type of project, but the court noted only that the plaintiff was unable to perform her job even after that accommodation was provided. Id. at 547.

Defendant says that a reduction in home visits was denied for "safety reasons," but that is a misstatement of Liegel's letter. Although Liegel stated that home visits could not be eliminated, he said as well that cases requiring home visits "will be transferred to other agents" when the visits posed a health and safety risk to plaintiff. Again, defendant is free to argue at trial that it was not feasible to transfer plaintiff's home visits to other agents, but it has not raised this issue at summary judgment.


B.  Constructive Discharge

The parties acknowledge that the Court of Appeals for the Seventh Circuit has not considered the question whether a claim for constructive discharge exists under the Rehabilitation Act, but it has assumed on a number of occasions that such a claim exists under the ADA. E.g., EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 440 (7th Cir. 2000);

18

Vollmert v. Wisconsin Department of Transportation, 197 F.3d 293, 297 (7th Cir.1999);
Silk v. Chicago, 194 F.3d 788, 803-04 (7th Cir.1999).  I see no reason to doubt that
assumption or to decline to apply it to claims under the Rehabilitation Act.  In the Title VII
context, the Supreme Court has determined that authorization for constructive discharge
claims is implicit in the prohibition on discriminatory changes in "the terms and conditions
of employment."  Pennsylvania State Police v. Suders, 542 U.S. 129, 143 (2004).  Because
the ADA and the Rehabilitation Act include a parallel provision, 42 U.S.C. § 12112(a), the
same rule should apply.

In determining whether an employee was constructively discharged, the question is
whether "she was forced to resign because her working conditions, from the standpoint of
the reasonable employee, had become unbearable."   EEOC v. University of Chicago
Hospitals, 276 F.3d 326, 331 (7th Cir. 2002).  Most cases applying this test involve "severe
or pervasive" harassment, e.g., Fischer v. Avande, Inc., 519 F.3d 393 (7th Cir. 2008), leading
defendant to argue that plaintiff cannot meet the standard because she was not subjected to
such harassment.  Although harassment may be the most common reason that employees
are constructively discharged, the test is not so limited.  Plaintiff may prevail so long as she
can show that her conditions of employment were objectively intolerable for a reason
prohibited by the statute.

In a footnote, defendant argues that a failure to provide accommodations could

19

constitute a constructive discharge only when it becomes "impossible" for the employee to do her job. Dfts.' Br., dkt. #17, at 16 n.6. Again, that is not the standard. In none of the hostile work environment cases has the court required a plaintiff to show that the harassment *physically prevented* her from doing her job, only that a reasonable person would feel compelled to resign under the circumstances.

A reasonable jury could find that plaintiff's conditions were objectively intolerable as a result of defendant's failure to accommodate her. Again, plaintiff has adduced evidence that her conditions at work not only failed to accommodate her conditions, but actually exacerbated them to the extent that she was in so much pain that she was throwing up at the end of the day. An employee should not have choose between her job and her health. It may be that, by December 2005, *no* accommodation would have been sufficient as a result of plaintiff's deteriorating condition, but that is not a question that defendant raised in its motion for summary judgment.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendant Wisconsin Department of Corrections, dkt. #16, is GRANTED with respect to plaintiff Wendy Sturz's claim that defendant violated the Rehabilitation Act by refusing to allow her

to work from home.  The motion is DENIED in all other respects.

Entered this 20th day of July, 2009.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge